# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3307
_____

Terry Skelton,                                   *
                                                 *
         Plaintiff-Appellant,                    *
                                                 *
              v.                                 *
                                                 *
William R. Rapps, Michael Henry,                 *
                                                 *
         Defendants-Appellees.                   *

_____

No. 98-3628                          Appeals from the United States
_____                         District Court for the
                                    Western District of Missouri.

Glenda Jackson, Individually;                    *
                                                 *
         Plaintiff-Appellant;                    *
                                                 *
              v.                                 *
                                                 *
William R. Rapps, Individually; Michael *
R. Henry; Bill LaRue;                            *
                                                 *
         Defendants-Appellees.                   *
-----------------------------------
William R. Rapps; Michael Henry;                 *
Bill LaRue;                                       *
                                                 *
         Third-Party Plaintiffs;                 *
                                                 *
              v.                                 *

United States of America; Health     *
Human Services; Donna E. Shalala,    *
Secretary of the United States Depart-   *
ment of Health and Human Services;   *
                                                  *
     Third-Party Defendants.      *

_____

Submitted:  June 17, 1999

Filed:  July 28, 1999
_____

Before BOWMAN and HEANEY, Circuit Judges, and LONGSTAFF, District Judge.[1]
_____

HEANEY, Circuit Judge.

In these consolidated appeals, Glenda Jackson, Terry Skelton, and a class of similarly-situated plaintiffs appeal the district court's dismissal for failure to prosecute their suit challenging Missouri's practices and policies in seeking reimbursement from noncustodial parents for monies distributed by the state to custodial parents under the Aid to Families with Dependent Children (AFDC) program.  We reverse and remand with directions.

I.

The history of these cases begins in June 1988, when Skelton sued former and present directors of Missouri's Division of Child Support Enforcement (DCSE), individually and in their official capacities.  He had been twice separated from his wife,

_____

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa, sitting by designation.

and during those separations, his wife and two minor children had received public assistance. He claimed the state of Missouri, pursuant to Mo. Rev. Stat. § 454.465.1(2) (1986),[2] had ordered him to reimburse the state for the full amount of AFDC benefits paid out to his minor children (such reimbursement obligations are referred to as "state debt") without regard to a formula prescribed by the Secretary of the Department of Health and Human Services, see 45 C.F.R. § 302.53(a) (1990).[3] The Missouri statute at issue, as originally enacted, simply equated the state debt with the amount of public assistance paid out. See Mo. Rev. Stat. § 454.465 (1982). The statute was amended in 1984 to allow the director of DCSE to set the state debt at an amount not exceeding the amount of public assistance, see Mo. Rev. Stat. § 454.465.1(2) (1986). However, DCSE policy was to continue to designate as state debt the full amount of public assistance paid out unless a lower amount was negotiated

[2]Section 454.465 provided that "payment of public assistance by [DSCE] . . . creates an obligation, to be called 'state debt,' which is due and owing to the division . . . in an amount equal to the amount of public assistance so paid." Mo. Rev. Stat. § 454.465 (1986) (amended 1984).

[3]Section 302.53(a) required that a child support obligation determined in the absence of a court order take into consideration:

(1) All earnings, income and resources of the absent parent including real and personal property;
(2) The earnings potential of the absent parent;
(3) The reasonable necessities of the absent parent;
(4) The ability of the absent parent to borrow;
(5) The needs of the child for whom the support is sought;
(6) The amount of assistance which would be paid to the child under the full standard of need of the State's IV-A plan;
(7) The existence of other dependents; and
(8) Other reasonable criteria which the State may choose to incorporate.

45 C.F.R. § 302.53(a), amended by 45 C.F.R. § 302.56 (1991).

with the noncustodial parent.[4]  Jackson filed a similar action in January 1989, and sought certification of a class of similarly-situated, noncustodial parents.  Both Skelton and Jackson requested injunctive and declaratory relief, as well as compensatory and punitive damages.

In August 1990, the district court granted class certification.[5]  The court also granted plaintiffs' summary judgment motions on the issue of liability in both cases, holding that the Supremacy Clause preempted Missouri's enforcement scheme, and declaring all administrative judgments fixing the state debt null and void.  See Skelton v. Rapps, No. 88-4232-CV-C-5, at 17 (W.D. Mo. Aug. 22, 1990); see also Appellants' App. Vol. I at 8 (docket in Jackson v. Rapps, No. 89-CV-4022).  The court enjoined defendants from further state debt collection proceedings, effective December 31, 1990, and denied defendants' cross-motions for summary judgment, concluding defendants were not entitled to absolute immunity or qualified immunity with respect to state debt collected under § 454.465 as amended.  The court determined, however, that defendants were entitled to qualified immunity with respect to state debt

---

[4]The record does not reveal the frequency with which noncustodial parents were able to negotiate a lower amount.

[5]The court certified a class consisting of:

[a]ll non-custodial parents whose children receive or have received AFDC payments through the state of Missouri pursuant to the post-1984 amended statute, Mo. Rev. Stat. § 454.465, whose support obligations have not been established by an order of a court of competent jurisdiction, and whose "state debt" was set by the Director of [DCSE] without consideration of the formula mandated by 45 C.F.R. § 302.50 and 45 C.F.R. § 302.53.

Jackson v. Rapps, 132 F.R.D. 226, 233 (W.D. Mo. 1990).  The court declined to extend certification to those noncustodial parents whose state debts were determined according to § 454.465 as originally enacted in 1982.

collections occurring prior to the 1984 amendment of § 454.465, because under the statute as originally enacted, the determination of the state debt had been a matter of statutory mandate rather than a discretionary function of the Director of DCSE. Finally, the court decided that plaintiffs' counsel was entitled to attorneys' fees and costs under 42 U.S.C. § 1988 "in an amount to be determined after a disposition on monetary damages." Skelton, No. 88-4232-CV-C-5, at 29; Appellants' App. Vol. I at 8.

On appeal, we affirmed the district court, holding that the Supremacy Clause prevented defendants from implementing a reimbursement policy other than that mandated by existing federal regulations. See Jackson v. Rapps, 947 F.2d 332, 337 (8th Cir. 1991). We also agreed with the district court that defendants were not entitled to absolute immunity in their individual capacities from a suit for damages because "the directors' policy of setting the amount of the state debt is an administrative function." See id. at 338. Finally, we noted the federal regulations at issue had been amended, and instructed the district court to consider the effect of those amendments upon its injunctions. See id. at 339. We remanded for further proceedings, see id., and our mandate issued after the Supreme Court denied certiorari on March 30, 1992, see Rapps v. Jackson, 503 U.S. 960 (1992).

Although the procedural history of these cases following remand is extensive, we recount it in some detail because we believe it is essential to understanding our decision today. On remand, the district court ordered the parties to submit a joint proposed scheduling order. The court also ordered plaintiffs to submit a brief addressing the issues presented on remand by May 11, 1992 and directed defendants to file a response thereto.

In their summary of the issues to be addressed on remand, plaintiffs contended they were entitled to seek a refund of illegally collected state debt. They also addressed the effect of the change in the applicable federal regulations, arguing that any attempt

-5-

to establish state debt for the time period prior to May 1991–when the governing federal regulations were modified–must be done in accordance with the terms of the district court's injunctions and the federal regulations in effect at the time. As for state debt arising after May 1991, plaintiffs maintained the injunctions should be modified only by substituting citations to the new federal regulations. Plaintiffs also noted the court had granted leave to amend the Jackson complaint following appeal to expand the scope of the class action. Finally, plaintiffs observed that there remained an unresolved due process claim, and that defendants had yet to adopt a method for administrative determination of the amount of the state debt that complied with federal regulations.

In their response, defendants contended that the Eleventh Amendment barred the district court from ordering refunds of state debt collected under § 454.465, and noted that plaintiffs had not requested such relief in their complaints. Defendants also argued that the plaintiff class should be notified that the district court could provide them with no further relief, and that they could seek redetermination of their state debt through existing administrative procedures. Defendants further argued that the court did not need to address plaintiffs' due process claim and that the district court had already rejected plaintiffs' effort to expand the plaintiff class. Finally, defendants addressed the effect of the change in the applicable federal regulations.

On June 18, 1992, the court held a scheduling conference at which a joint proposed scheduling order was rejected.[6] On June 23, the court directed the parties to meet and determine by August 21, 1992, a method for computing refunds due to class members, including interest, and to submit a memorandum detailing that method.[7] The

---

[6]The record does not reveal why the proposed scheduling order was rejected.

[7]This order appears to be the basis for the plaintiffs' contention that the district court had decided that members of the plaintiff class were entitled to refunds and interest and that the only remaining issue was the amount of the refund to which each class member was entitled. The defendants dispute this contention.

joint memorandum was filed on October 2, 1992, after defendants were granted two extensions of time. In the joint memorandum, the parties agreed that any state debt collections occurring after the district court's August 13, 1990 order would be refundable, including tax refunds intercepted after that date. (Appellants' App. Vol. I at 112.) The parties also agreed that interest should be paid on any refunds ordered by the court, but disagreed as to the rate of interest–plaintiffs suggested 9%, and defendants proposed a rate of 3.51% based on interest earned on Treasury notes and bonds.

More importantly, the parties disagreed as to whether the state could be required to refund the state debt collected between August 1984[8] and the court's August 1990 order, estimated by defendants to be $5.8 million. Defendants maintained that the Eleventh Amendment barred plaintiffs from recovering refunds for collections of state debt prior to the district court's August 1990 order. Defendants also asserted that although approximately $306,000 had been collected in the time between the district court's August 1990 judgment and the December 1990 effective date of the injunctions, that sum did not represent funds collected pursuant to unlawful administrative determinations of state debt, but consisted primarily of collections of arrearages on current support orders or "misapplied payments." Furthermore, defendants contended that any refunds for the period between August 1984 and August 1990 should be offset by the amount the state could lawfully have collected from the plaintiffs if it had computed the state debt in accordance with federal regulations. The defendants did not, however, argue that refunds were barred or limited by the statute of limitations.

_____

[8]Although there appears to be some confusion as to the date on which a refund period would begin, we believe the relevant date is June 18, 1984, when the amended version of § 454.465 took effect. See 1984 Mo. Laws 725. This is because the district court, in its August 1990 order, determined that defendants were entitled to qualified immunity from the date § 454.465 was first enacted until, pursuant to the 1984 amendment, the Director of DCSE assumed discretion in the determination of the amount of the state debt. See Skelton, No. 88-4232-CV-C-5, at 25.

The parties also disagreed on notification of the plaintiff class–even whether such notice should be delivered by regular or certified mail. Finally, although the parties reported that they had made no progress toward a settlement of Jackson's and Skelton's individual claims, the parties' attorneys stated that they believed they could resolve some of the remaining disputes through continued negotiations.

In May 1993, pursuant to a court order for a status report, plaintiffs' counsel directed a letter to the court stating the parties had met in December 1992 to discuss the remaining issues, but negotiations had been hampered by confusion regarding settlement authority due to shifts in DCSE management and by the state's failure to produce definite figures regarding the amount of state debt collected. Counsel complained that the state's records were "too chaotic" to enable location of individuals from whom state debt had been collected, and noted defendants had taken the position that the plaintiffs would have to amend their complaints to demand refunds. Counsel also reported that additional discovery would be necessary to conclude the matter as essential data was still lacking. Finally, counsel suggested the court "move [the] case along" by scheduling a conference attended by the parties and representatives from DCSE and the governor's office.

In November 1993, the court again ordered a joint status report addressing whether plaintiffs intended to file an amended complaint requesting refunds and when the parties expected such refunds would be made.[9] In response, the parties reported that plaintiffs intended to file an amended complaint by the end of the first week in December. With regard to refunds, defendants stated they had refunded $369,099.01 in administrative state debt collected after the court's August 1990 judgment. However, the parties noted they had been unable to resolve issues regarding refunds for state debt collections between 1984 and 1990: plaintiffs were unsatisfied with

_____

[9]Here again, plaintiffs take the position that this order shows the district court had determined that the class members were entitled to refunds.

materials provided by defendants, the refund issue was not yet formally before the court, and there remained unresolved legal disputes concerning refunds for that period. The parties promised to continue their efforts at an informal resolution.

Plaintiffs filed an amended complaint in the class action on February 3, 1994, seeking, inter alia, refunds of sums unlawfully seized, a declaration that defendants were barred by the statute of limitations from offsetting refunds to plaintiffs by the amount of arrearages that had accrued more than five years earlier, and an award of attorneys' fees, expenses, and costs.  In their April 1994 answer, defendants raised statute of limitations, Eleventh Amendment, and official immunity defenses, and brought a counterclaim against plaintiffs seeking to offset any state debt refunds by the amount the state could lawfully have collected.  Defendants also brought a third-party complaint against the United States, seeking to recover payments the state made to the federal government from state debt collections.  The United States filed an answer in June 1994 in which it claimed that the court lacked subject-matter jurisdiction over the third-party complaint, that the complaint failed to state a claim, and that the complaint had been filed without leave of court, contrary to Federal Rule of Civil Procedure 14(b).  The United States otherwise generally denied the allegations of the third-party complaint.

In September 1994, the court ordered yet another status report.  Plaintiff filed a second amended complaint in November 1994, raising new issues related to the state's interception of tax refunds to satisfy state debts.  In June 1996, the court again ordered a status report.  In their separate status report, plaintiffs reported no progress on the refund issue, and requested court-directed settlement negotiations.  In their status report, defendants stated that they intended to file a motion to amend or dissolve a portion of the district court's injunctions with respect to defendants' ability to establish and collect state debt.  They also suggested that a dismissal for failure to prosecute might be justified.

On December 12, 1996, the district court conducted a telephone conference, and directed the parties' attorneys to "meet and work out [a] final agreement . . . by January 2, 1997." On December 23, 1996, defendants filed their motion for relief from the court's injunctions, which the court granted in part in June 1997.[10] The court ordered a final round of status reports in December 1997. In their separate status report, plaintiffs asserted that defendants had raised multiple arguments in an effort to relitigate issues that were either frivolous or that had already been decided, including that refunds were barred by the Eleventh Amendment and the three-year statute of limitations, and that defendants were immune from any claim for refunds or monetary damages. Plaintiffs also questioned the validity of the state's counterclaim. Finally, plaintiffs stated that further settlement efforts would be futile without the participation of the district court. In their response, defendants argued that the cases had essentially been dormant since 1994 and should be dismissed for lack of prosecution.

In February 1998, defendants and the United States moved for dismissal under Federal Rule of Civil Procedure 41(b) for failure to prosecute. Defendants and the United States argued the individual plaintiffs had failed to articulate how they had been harmed by state debt collection practices prior to the 1990 injunction. With respect to the class action, defendants and the United States contended that since 1992, plaintiffs had done nothing to resolve the refund issue, with the exception of filing the 1994 amended complaint and making lukewarm settlement efforts. Plaintiffs responded by disputing the sincerity of defendants' participation in settlement talks and again asking for intervention from the court in the form of an extended conference with the

---

[10]The court modified the injunctions by substituting 45 C.F.R. §§ 302.50 and 302.56–the new federal regulations–for § 302.53, which had been repealed. The court rejected as premature defendants' argument that the injunction should be modified to reflect that Missouri had adopted a method of computing the state debt in compliance with § 302.50.

parties–including state officials with the authority to enter into a settlement–to determine the remaining issues and set a schedule for further proceedings.

In June 1998, the court granted defendants' and the United States' motion, concluding it could "no longer . . . shoulder the burden of getting [the] case[s] resolved," and dismissing both the individual and class actions for failure to prosecute. The court stated that it had repeatedly attempted to move the case along by scheduling telephone conferences and requesting status reports, and that "[p]laintiffs could and should have requested relief from this Court if they were having problems with discovery and scheduling settlement conferences."

Plaintiffs appeal, contending the district court abused its discretion in dismissing for failure to prosecute. We agree and reverse.

II.

We review a district court's dismissal for failure to prosecute for abuse of discretion, balancing the court's need to advance a crowded docket against the consequences of denying a plaintiff's day in court. See Garland v. Peebles, 1 F.3d 683, 686 (8th Cir. 1993). Such a dismissal is a "'drastic and extremely harsh sanction,'" Norman v. Arkansas Dept. of Educ., 79 F.3d 748, 751 (8th Cir. 1996) (quoting Clayton v. White Hall Sch. Dist., 778 F.2d 457, 460 (8th Cir. 1985)), and is proper only when there has been "'a clear record of delay or contumacious conduct by the plaintiff,'" see Garland, 1 F.3d at 686 (quoting Brown v. Frey, 806 F.2d 801, 803 (8th Cir. 1986)).

We are unable to find such a clear record here. While it is beyond dispute that these cases have lingered too long on the district court's docket, we cannot agree with the district court that plaintiffs alone should shoulder responsibility for the lengthy delay. In particular, we believe the court incorrectly faulted plaintiffs for failing to enlist the court's assistance in moving the case forward. Our review of the record

-11-

indicates plaintiffs explicitly and repeatedly requested such assistance in the form of settlement intervention. Furthermore, we think it was apparent as early as June 1992, when the parties submitted their joint memorandum, that there were fundamental conflicts between the parties' views of the case–conflicts unlikely to be resolved by undirected and informal settlement talks.

In retrospect, it seems clear that plaintiffs should have filed a motion for partial summary judgment or other dispositive motions, which would have brought the issues in dispute before the court for resolution. The only excuse that plaintiffs can give for not doing so is that they believed the court, in granting their motion for summary judgment, had determined that the class was entitled to refunds and interest on all amounts improperly collected from the plaintiff class. Thus, they believed that the only matters remaining to be resolved were those relating to the amounts the class members would receive, and that the district court intended that the parties would reach such a resolution through negotiations. The defendants, of course, disagreed. Under these circumstances, and particularly in view of the district court's obvious preference for having the parties resolve the contested issues through negotiation, we are not prepared to accept the drastic sanction of dismissal imposed by the district court. We therefore conclude the district court abused its discretion in dismissing the actions. Although we acknowledge the district court's substantial latitude in controlling its docket and the responsibility of the plaintiffs to prosecute their cases diligently, we cannot allow the court to dismiss these troublesome cases simply because they would not go away of their own accord. The important issues previously delineated remain to be decided by the district court, and until they are decided, there is scant possibility that the parties will be able to settle these cases. Because of this apparent procedural gridlock we do not believe that a simple remand would be appropriate.

We rather direct that on remand, in the event the plaintiffs wish to continue to prosecute this action, they shall promptly file a motion for partial summary judgment or other dispositive motion or motions in order to place before the district court all

disputed issues. The defendants will, in their response, have an opportunity to raise the various legal and equitable defenses heretofore outlined in this opinion and any other defenses they deem necessary. The district court shall then, in its discretion, direct the parties to brief the issues raised by plaintiffs' dispositive motion and shall set a timetable for the submission of the briefs. The district court will then determine the issues that have been raised by plaintiffs' motion and the response thereto. If the district court rules the class members are entitled to refunds, it may, in its discretion, appoint a master to submit a report and recommendations to the district court regarding the amount of the refund that each class member shall receive. The district court shall then enter such orders it considers appropriate.

It appears that although the state has refunded the class some $306,000 for state debt collected directly or through tax intercepts after the district court's August 1990 order, there apparently remains a disagreement as to whether this constitutes the full amount unlawfully collected by the state after the court's order. It also seems clear that no interest has been paid on these sums. It is further apparent that no refunds have been made to either the named plaintiffs or the class for the period from June 18, 1984, through August 13, 1990. This is because the defendants continue to assert (1) that refunds are barred by the Eleventh Amendment and by official immunity; (2) that refunds are barred or at least limited by the applicable statute of limitations; and (3) that in any event refunds must be offset by the sums defendants could have lawfully collected from the plaintiff class. Moreover, there are continuing disagreements concerning the rate of interest that should be paid on any refunds ordered by the court and the notification of the plaintiff class.

Finally, we note the district court and this court authorized an award of attorneys' fees for legal services rendered through the date of the respective decisions. The amount of attorneys' fees in the district court, however, was left open "to be determined after a disposition on monetary damages." It appears that this issue has not yet been addressed, and that no payments have been made for services rendered in the

district court.  This should also be addressed on remand, as should any other remaining barriers to the resolution of this case.

Accordingly, we reverse and remand to the district court for further proceedings not inconsistent with this opinion.  Let this mandate issue forthwith.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.